UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

FAIR HOUSING COUNCIL OF OREGON,

             Plaintiff,

    v.

BROOKSIDE VILLAGE OWNERS
ASSOCIATION, and BRADLEY REALTY,
LLC,

             Defendants.

Case No. 3:08-cv-3127 -ST

FINDINGS AND
RECOMMENDATIONS

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Fair Housing Council of Oregon ("FHCO"), a nonprofit corporation, filed suit

against Brookside Village and/or Brookside Village Owners Association ("Brookside Village"),

Christopher Jones, ("Jones"), Michael and Nancy Stark ("the Starks"), River City Realty & Mgt.

Inc. and/or River City Realty & Mgt. LLC, ("River City Realty"), and Bradley Realty and/or

Bradley Realty, LLC ("Bradley Realty"), seeking to enforce provisions of the Fair Housing Act,

as amended by the Fair Housing Amendments Act of 1988 ("FHAA"), 42 USC § 3601, *et seq.*

(First, Second and Third Claims), and the comparable Oregon statute, ORS 659A.421 (Fourth,

Fifth and Sixth Claims).   FHCO also alleges claims for negligence under Oregon law (Seventh

and Eighth Claims), and seeks compensatory, declaratory, and injunctive relief.  All parties

except Brookside Village and Bradley Realty have reached a settlement or otherwise been dismissed.[1]  This court has federal question jurisdiction over the FHAA claims under 28 USC § 1331 and supplemental jurisdiction over the state law claim under 28 USC § 1367(a).

FHCO has filed a Motion for Partial Summary Judgment (docket #107) and Bradley Realty and Brookside Village have each filed a Motion for Summary Judgment (dockets #104 and #110).  For the reasons that follow, Bradley Realty's Motion should be granted and FHCO and Brookside Village's motions should be granted in part and denied in part.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any material fact and "the moving party is entitled to judgment as a matter of law."  The moving party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d 1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

///

///

///

---

[1] As a result, the Second, Fifth and Eighth Claims against River City Realty and the Third, Sixth and Eighth Claims against Stark, Jones and Jane Doe have been dismissed.

## UNDISPUTED FACTS

### I.    Brookside Village

#### A.    1977-2006

In 1977, Brookside Village was incorporated pursuant to the Declarations of Conditions, Restrictions, Covenants and Regulations of Brookside Village ("CC&R").  Harris Aff. (docket #110-3), Ex. 1.[2]  The community was developed and built in Rogue River, Oregon, by Kiernan Hawkins 75-2 Ltd. ("Kiernan").  *Id*, p. 2.   After selling the last property in the community, Kiernan conveyed the common areas to Brookside Village in July 1979.  *Id*.  Brookside Village contains 80 dwellings, which are nearly identical in size and construction, and has narrow private streets, no sidewalks, two open spaces, a clubhouse, and a pool.  *Id*, pp. 2-3, Exs. 3-4; Michelsen Decl. (docket #109), Ex. A, p. 3; Harding Depo.,[3] p. 27; J. Ward Depo., pp. 21-22.  It is governed and managed by a Board of Directors ("Board") in accordance with the Bylaws, CC&R, and other rules and regulations.  CC&R § 3.2.6(2); Harris Aff., p.2, Ex. 2 (1977 Bylaws); Harding Depo., p. 27.  The Board has the right to "promulgate reasonable rules and regulations," including "rules restricting persons under or over designated ages from using certain portions of [Brookside Village] during certain times."  CC&R, § 2.2.3.  In the event of a conflict between the CC&R and the Bylaws or any other rules adopted by the Board, the CC&R control.  CC&R, § 3.2.6(2)(e).

As adopted in 1977, the CC&R were binding until January 1, 2000, at which time they were automatically extended for successive periods of five years unless, at the end of one of

---

[2]  Several copies of the CC&R are in the record.  Unless otherwise indicated, citation is directly to the appropriate sections of the CC&R, rather than the document to which it is attached.

[3]  Both parties have submitted documents with various attachments, including multiple excerpts of depositions.  Unless otherwise indicated, all citations to depositions are to the last name of the deponent and the page(s) of the deposition transcript.

those five-year periods, the Board convenes a special meeting for the purpose of terminating the

CC&R, and two-thirds of the Board votes in favor of termination.  CC&R, § 9.0.   According to

the Board, the CC&R cannot be amended, but can only be terminated.  Michelsen Decl., Ex. H,

p. 3; Harris Aff., p. 2.  The CC&R contain the following occupancy restriction to adults 18 and

over:

> No children under the age of 18 years shall be allowed to live as a
> permanent resident on the project.  Notwithstanding this restriction,
> children of less than 18 years of age shall be allowed to stay with the unit
> owners from time to time on a temporary basis so long as said children are
> properly supervised by the unit owner and any such children shall not be
> allowed to use the common elements unless the unit owner is present with
> them.

CC&R, § 1.19.

In 1984, Kiernan sought input regarding the building of multi-family housing on land

adjacent to Brookside Village.  Harris Aff., p. 5.  Many of the residents were vigorously opposed

to such a proposal and sent a letter to the Planning Commission voicing the following objections:

> Most of us were of the opinion that [the adjoining land] would be used for
> more adult housing.  Of course we do not object to "housing for families,"
> but it seems to us that it would be far better for both families with children
> and we "older adults" if the two areas were not adjoining.  Children should
> have adequate play areas and be able to make noise!  Likewise, we older
> adults, who no longer have children living with us, and who have chosen
> this adult community and the peaceful living we have here, should be
> privileged to live in such an atmosphere.  We have chosen and paid for the
> atmosphere!

*Id*, p. 5, Ex. 14 (emphasis in original).

In 1985, a sign was erected at the entrance to Brookside Village, reading "Brookside

Adult Village."  *Id*, p. 6, Ex. 16; Michelsen Decl., Ex. A, p. 1, Ex. D, p. 1; Harding Depo., p. 52.

In 1987, the Board formally adopted an Introduction and Rules and Regulations

("Rules") for the community.  Michelsen Decl., Ex. D, pp. 2-3.  The Rules were intended as a

4 - FINDINGS AND RECOMMENDATIONS

general summary and, unlike the CC&R, were not intended as a basis for rule enforcement.  *Id*, Ex. H, p. 7.  The Board intended that the Rules be handed out to new residents of Brookside Village, either by the real estate company, someone on the Board, or a neighbor, but this did not always happen.  *Id*; Harding Depo., pp. 32, 34.  The Rules appear to have been revised in 2004.  Michelsen Decl., Ex. H, p. 8.  They have never been repealed, but were superseded in part after this litigation began.  *Id*, p. 7; Harding Depo., pp. 34-35.

By 1993, the Board began publishing the Brookside Village Directory ("Directory") approximately every other year.  Michelsen Decl., Ex. E.  Each copy of the Directory included a copy of the Rules.  *Id*; Harris Depo., p. 100.  Until 2009, the first or last page of the Directories contained the following statement:  "Brookside Village is a community of Adults who agree to live in harmony with certain rules that are deemed to benefit all."  Michelsen Decl., Ex. E, pp. 7-19.  Inside the opposite cover appeared the following statement:  "Children under 18 are not permitted to live in the Village, but reasonable visitation is something many of us look forward to periodically."  *Id*, pp. 2, 5, 8, 10, 13, 17, 19.  Immediately following this statement were the rules regarding use of the pool, including a rule that children must leave the pool by 4:00 pm and must be supervised by a resident relative at all times when using the pool or the clubhouse area.  *Id*.  In the 2007-08 Directory, that time was changed to 6:30 pm.  *Id*, pp. 7-8.  The Board had an informal "welcome person" who was supposed to distribute a copy of the Directory to new residents by going door-to-door.  Harris Depo., p. 139; Harding Depo., p. 79.  The Directory was intended to be a summary of the main rules that residents were expected to follow.  Harris Depo., p. 100.

For several years, the Board also paid for and distributed to residents with the Board minutes a monthly newsletter called "The Villager."  *Id*, p. 147.  The Board did not have control

over the newsletter's content.  *Id*, pp. 147-48; Michelsen Decl., Ex. D, p. 16.  The Board stopped

producing The Villager in approximately 2009.  Harris Depo., p. 148.

As early as August 15, 2003, the Board discussed amending the Bylaws to change

"[Brookside Village] to be a 55 and over village."  Michelsen Decl., Ex. D, p. 5; Harris Aff.,

p. 6, Ex. 18, p. 2.   As part of its plan to work toward this goal, the Board minutes note that a

Board member "will meet again with realtors re: quotes as to 'adult only village' [and] also title

co. needs to give CC&R and Bylaws to each new resident/owner."  Michelsen Decl., Ex. D, p. 5.

Board minutes from 2003-05 occasionally refer to becoming "55 and over," as well as the impact

that change would have on the CC&R and the Bylaws.  *Id*, pp. 6-7, 10-13; Harris Aff., p. 6,

Ex. 18, pp. 3-22.  On February 15, 2005, the homeowners voted on whether Brookside Village

should become an age 55 and older community.  Michelsen Decl., Ex. D., p. 14; Harris Aff., p. 6,

Ex. 18, pp. 23-24.  Although the vote was 35 "yes" to 33 "no" votes, the Board concluded that

the "implementation  . . .  failed" because the measure "needed to have 64 yes votes" to pass.

Harris Aff., p. 6, Ex. 18, p. 25.  Then-President Julie Rogers believed that the Board voted not to

"convert" to avoid the necessary legal requirements and expenses and based on its belief that "it

was not impermissible to restrict residency in [Brookside Village] to persons 18 years of age or

older."  Michelsen Decl., Ex. H, p. 6.

In August 2006, the Anderson family moved into Brookside Village.  *Id*, Ex. C, p. 2.  At

that time, Anderson and his wife were less than 55 years old, and their daughter was five years

old.  *Id*.  They were not asked to provide proof of their age to anyone, though they were given a

rental agreement and a copy of the Rules by their landlord shortly before moving in.  *Id*.  Shortly

after moving in, they noticed people staring at them, and "two ladies" came to the door and gave

them a copy of the Directory.  *Id*.  A few days after receiving the Directory, a man who identified

himself as the President of the homeowners association came to the door with "two ladies" and told them that they were not allowed to live there because they "had a child and children were not allowed."  *Id*.  The Andersons ultimately moved out and filed a lawsuit against Brookside Village.  *Id*.  The September 2006 issue of "The Village" discussed the fact that a family recently had to move due to having a young daughter, apparently referencing the Andersons.  Michelsen Decl., Ex. D, p. 28.   The Andersons' lawsuit was later settled.  Harris Aff., p. 3, Ex. 5; Paradis Aff. (docket #106), Ex. 7.

In 2006, the Board President used a form to notify residents of violations of aesthetic standards.  Harris Aff., p. 5, Ex. 13.  The Board has no evidence that this form was ever used to enforce the CC&R age restrictions or was used before or after 2006.  *Id*.

### B.    2007 Conversion to 55 and Older Community

On November 13, 2007, the Board discussed the possibility of interviewing new renters and buyers before they moved in, in order to explain the rules and regulations and perhaps "prevent future problems."  Michelsen Decl., Ex. D, p. 18.  The November 2007 issue of The Villager stated that Brookside Village had become aware that new residents were not being informed of "what they can and cannot do when the move in," as evidenced by recent rule violations, including "underage children" in the Village and various vehicles impermissibly parked in the street.   *Id*, p. 29.  The newsletter encouraged people to review the CC&R, specifically stating that "children under the age of eighteen cannot live in the Village.  To disregard any warnings can lead to eviction, fines or both."   *Id*, pp. 29-30.

On May 6, 2008, FHCO sent a letter to Brookside Village, addressed to Robert Braga, advising that its advertising and rules violated the FHAA, requesting that it comply with the FHAA by agreeing to various terms, demanding the payment of damages and attorney fees, and

requesting a response by June 15, 2008.  Good Decl., ¶ 14, Ex. 1.  On June 9, 2008, FHCA sent

an identical letter to Brookside Village at another address, requesting a response by June 27,

2008.  Harris Aff., Ex. 20.  FHCA did not receive a favorable response.   Good Decl., ¶ 14.

However, on June 25, 2008, the homeowners voted 75-3 to pass the following change to

the Bylaws:

> RESOLVED, the following is added to Article I, as Section 5 pursuant to
> the bylaws of Brookside Village Homeowner's Association:
> > "Brookside Village is a 55 years old and older community pursuant
> > to 42 USC § 3607.  Brookside Village will comply with 42 USC
> > § 3607 and the board of directors is authorized to take the steps
> > necessary to assure and enforce compliance."

*Id*, Ex. F, p. 1; Harris Aff., pp. 3, 6, Exs. 6, 17.

This was the first time that Brookside Village changed from being "adults only" to "55

and older."  Harris Depo., p. 24.  Previously, the Board did not screen or otherwise check

prospective renters or residents.  Harding Depo., pp. 82-83.  After the vote, Brookside Village

adopted a written "55 and Older Policy."  Michelsen Decl., Ex. F, p. 3; Harris Aff., p. 3, Ex. 7,

p. 1.  This was the only written policy promulgated in response to the change and is still in effect.

Harris Depo., pp. 107-08.  On June 27, 2008, Brookside Village repainted the sign at the

entrance to read "Brookside 55+ Village."  Michelsen Decl., Ex. A, p. 2; Harding Depo., p. 53;

Harris Aff., p. 5, Ex. 12.

In June 2008, The Villager ran a quote from the Board President, expressing his pleasure

about the vote to become a 55 and older development.   Michelsen Decl., Ex. D, pp. 30-31.

On June 30, 2008, the Board sent a letter, signed by then-Board President Robert Braga, advising

all Brookside Village homeowners of the results of the Board's "special election to become a 55

and older community."  Michelsen Decl., Ex. F, p. 2; Harris Aff., p. 3, Ex. 7, p. 4; Harris Depo.,

p. 108.  The letter explained that owners and tenants who resided in Brookside Village prior to

the resolution are "covered under the grandfather clause," but that "any sale or rental agreement made after this date must comply with the new amendment" requiring that one owner resident or tenant be at least 55 years old.  *Id.*

On October 14, 2008, the Rules were updated to state that "[i]ndividuals under the age of 55 are not permitted to live in Brookside Village.  Short visits are allowed."  Michelsen Decl., Ex. D, p. 23.  This version of the Rules was not handed out, but kept in the office in case someone had a question about the change.  Harris Depo., p. 106.

On January 21, 2009, then-Board Secretary Roger Harding sent a notice to the Grants Pass Daily Courier's classified advertising department, advising that Brookside Village met the requirements for exemption for housing for the elderly in accordance with the FHAA.  Harding Depo., p. 123; Michelsen Decl., Ex. G, p. 4.  In addition, the statement in the 2009-10 Directory was changed to read as follows:  "Brookside Village is a 55 and older Planned Unit Development.  Policies and Procedures, based on federal housing law, have been put into place to ensure the village retains this status."  Michelsen Decl., Ex. E, pp. 4-6.

On April 14, 2009, the Board minutes acknowledge a pending lawsuit against Brookside Village and state that a "letter regarding what it means to own in a 55+ community and property owner responsibilities will be sent to all property owners in the next two weeks."  *Id*, Ex. D, p. 25.  On May 1, 2009, the new Board President Kathy Harris sent a letter to all Brookside Village homeowners to make them "aware of your rights as well as the rights of any potential buyers or renters of your Brookside Village property," in light of the fact that Brookside Village was a 55 and older community.  *Id*, Ex. F, p. 4; Harris Depo., p. 45; Harris Aff., p. 3, Ex. 7, pp. 2-3.  The letter explained several of the FHAA's requirements for maintaining an age-restricted community and mentioned that the Board planned to update the CC&R and Bylaws in order to

9 - FINDINGS AND RECOMMENDATIONS

comply with federal law "at the earliest opportunity," which would be 2010 for the CC&R.

Michelsen Decl., Ex. F, pp. 4-5; Harris Aff., p. 3, Ex. 7, pp. 2-3.  The letter included a packet

with the relevant federal regulations and advised homeowners to "review and keep them in a safe

place as the codes need to be given to any future owners of your property, along with a copy of

the CC&R."  *Id*.

On June 1, 2009, the Board sent a letter asking occupants to complete an enclosed

"Verification of Occupancy" form, which was required in order for Brookside Village to

maintain its status as a 55 and over community.  Michelsen Decl., Ex. F, p. 6; Harris Depo.

pp. 32, 47-48.  Occupants were advised that their "information will be kept in a locked file

cabinet in the office."  Michelsen Decl., Ex. F, p. 6; Harris Depo., p. 20.   The form asked

occupants to affirm that at least one person living at the residence is 55 years of age or older, and

noted that proof of age was required in the form of a driver's license, birth certificate, passport,

immigration card, military identification, other official documents "containing a birth date of

comparable reliability," or a certification in a lease, affidavit, or other document signed by any

member of the household asserting that at least one person in the unit met the age requirement.

Michelsen Decl., Ex. F, p. 7.  If no one living in the unit met the age requirement, then the

residents' ages were reported.  *Id*.  At the bottom of the form is a note to the "census taker" to

"[p]lease mark with an 'X' the form of identification you verified."  *Id*.  Harris supervised the

verification process, which was actually conducted by three or four residents who went to every

door and asked for proof of age and for the resident to complete the age-verification form.

Harding Depo., p. 85.  This was the first official survey conducted to determine residents' ages.

*Id*, pp. 137-38; Harris Depo., pp. 27-29.  The August 11, 2009 Board minutes reflect that the

"age verification process [was] conducted in June[,] and process stopped once 80% verification

10 - FINDINGS AND RECOMMENDATIONS

had been secured."  Michelsen Decl., Ex. D, p. 27; Ex. R, pp. 79-155 (completed surveys).

On August 14, 2009, the Board sent another letter to owners and residents, advising that Brookside Village's status as a "55 and over" community imposed certain requirements on the members.  *Id*, Ex. F, p. 8.  It attached a copy of the relevant policies.  *Id*, pp. 8-10; Harris Depo., pp. 48-49.  The Board wanted homeowners to take responsibility for ensuring that a new renter or buyer would fill out the form attesting at least one occupant was 55 years old or older. Michelsen Decl., Ex. F, p. 10; Harris Aff., p. 3, Ex. 8; Harris Depo., pp. 48-49; Harding Depo., p. 83.  Despite the Board's efforts, Harris learned that the homeowners were not informing their renters about the changed policy, requiring them to fill out the form, or giving them copies of the CC&R.  Harris Depo., pp. 136-37.  As a result, she started asking her "welcome to the neighborhood" Board member to ask new residents to fill out the form when welcoming the resident and giving them the Directory.  *Id*, pp. 137-39.

In June 2011, Harding conducted another verification of occupancy survey, using the same form as used in June 2009.  Harding Depo., pp. 83, 85-86; Michelsen Decl., Ex. R, pp. 1-78 (completed surveys).  Harding went door-to-door over the course of several days in late June, asking residents to show proper identification and asking them to complete the form.  Harding Depo., pp. 85-86.  He "did not go back to those people who were there who were 55-plus two years ago," and instead "just went to those who were relatively new, and went through that process."  *Id*, p. 86.  Though he found it "a pretty embarrassing process [to] ask[ ] someone who is very old to verify that they are 55-plus," Harding still asked them to show identification and fill out the form.  *Id*.  The Board does not currently maintain any information regarding each unit, other than to keep track of who is current on their dues.  *Id*, p. 38.

///

11 - FINDINGS AND RECOMMENDATIONS

Harris later prepared a summary of the ages of Brookside residents as of 2000 in order to establish that by 2000, substantially more than 80% of the residences in Brookside Village had at least one person who was 55 years old.  Harris Aff., pp. 4-5, Exs. 9-10.  Harris's summary (Exhibit 9) and the 2011-12 Directory (Exhibit 10) are the subject of a heated evidentiary dispute regarding their reliability.

## II.    **Bradley Realty**

Bradley Realty is a real estate agency based in Rogue River, Oregon, which has been in business for approximately 20 years.  T. Ward Depo., p. 16.   The majority of its listings are for properties in Rogue River.  *Id*.

In 2006, James Ward was a new broker with Bradley Realty.  J. Ward Depo., p. 13.   In 2006, Bradley Realty paid for all real estate ads, but each broker developed ads for his or her listings.  T. Ward Depo., p. 25.   In May 2006, former defendant Jones listed his residence in Brookside Village ("Property") with James Ward.   J. Ward Depo., pp. 14-15.  As part of his advertising for the Property, James Ward placed ads that described the home as located in an "adult community."   *Id*, p. 31; Michelsen Decl., Ex. I, p. 8, Ex. J.  At some point, Theresa Ward, the principal broker at Bradley Realty, noticed that the advertisement for the Property contained the word "adult" and changed the ad to remove that word.  T. Ward Aff. (docket #135), ¶ 4, Ex. 6.  The only copy of this changed ad is from March 2007, before the Property sold in April 2007. *Id*; J. Ward Depo., p. 15.

In November 2006, FHCO was alerted to alleged discriminatory housing practices occurring in Rogue River.  Michelsen Decl., Ex. V ("Good Decl."), p. 4, ¶ 10; Good Depo., pp. 15, 22, 25.  FHCO opened a file to investigate the allegations.  *Id*.  As part of FHCO's investigation, it reviewed materials from Brookside Village stating that it did not allow children

under age 18 to live in the Village.  *Id*.  FHCO also reviewed advertisements from the area,

including those from Bradley Realty and others, stating that Brookside Village was an "adult

community."  *Id*.

FHCO also used two testers ("Tester Alpha" and "Tester Bravo") to call Bradley Realty

and impersonate buyers interested in the Property.  Paradis Aff., Ex. 4 (Tester Alpha Report)

(under seal), Ex. 5 (Tester Bravo Report) (under seal).[4]  FHCO initially recruited and trained

Tester Alpha in 2003 and Tester Bravo in 1999.   Michelsen Decl., Ex. K, pp. 1, 9.  FHCO paid

each tester $20.00 for the telephone call.  Tester Alpha Depo., p. 36; Tester Bravo Depo., p. 24.

FHCO provided the testers with a "profile," which outlines whom the testers are supposed to

impersonate and providing some questions to ask.  Tester Alpha Depo., p. 15.  Both testers recall

speaking to "Jim" at Bradley Realty, who is presumably James Ward.

On November 29, 2006, at approximately 1:45 pm, Tester Alpha called Bradley Realty

asking about the Property.  Paradis Aff., Ex. 4; Michelsen Decl., Ex. K, pp. 1-8.  Tester Alpha

spoke to "Jim" and represented herself as a woman looking to buy a house for herself and her

family.  Tester Alpha Depo., pp. 20, 27, 36; Michelsen Decl., Ex. K, pp. 3, 6.  She mentioned

that she was inquiring about a "house for sale in the Brookside community."  Michelsen Decl.,

Ex. K, p. 6.  Jim asked "you mean the Brookside adult community?" to which Tester Alpha

responded, "what does that mean, adult community?"  *Id*.   Jim said "hold on, I'll check," spoke

to someone in the room to ask if that meant 18 years and older, and then got back on the line and

told her that it was for 18 and over, which was "kinda like a 55 and over but it was for 18 and

over," adding that "they are kinda rare."  *Id*; Tester Alpha Depo., pp. 27, 20.  In response, Tester

---

[4] The tester's reports and depositions are under seal only to protect the identities of the testers, not the
contents of their testimony or reports.  By referring to the testers by pseudonyms, it is not necessary to
perform any redactions.

Alpha said that her son was not 18, but the house was in their price range, which led Jim to respond that she would have trouble finding anything in that price range except for in older parts of Grants Pass.  Michelsen Decl., Ex. K, p. 6.  Jim then inquired as to the age of her son.  *Id.*  Tester Alpha responded that "he is 8 not 18" and asked about the homeowner fees and if there were any other exclusions or rules.  *Id.*  Jim responded that the fees were "cheap" and covered the pool and clubhouse, but that even though there were no more rules, "it won't work for you if your son is only 8 years old."  *Id.*  Jim then offered to pull up other listings in the area in her price range.  *Id.*  Tester Alpha thanked him for his time and ended the call at 1:50 pm.  *Id.*

The following day, on November 30, 2006, at approximately 12:07 pm, Tester Bravo called Bradley Realty representing herself as a married woman interested in purchasing a home.  Paradis Aff., Ex. 5; Tester Bravo Depo., p. 88; Michelsen Decl., Ex. K, pp. 9-18.  Tester Bravo said that her "husband had seen an advertisement on the internet for a residential house in the Brookside adult village community."  Tester Bravo Depo., p. 88.  She was told by "Jim" that the house was listed at $172,000, and then she heard a rustling of some papers followed by "it's an adult community, which means you need to be 18 years of age or older" and "not to be confused with 50 or older."  *Id*, p. 89; Michelsen Decl., Ex. K, p. 17.  He went on to explain that this was a "PUD" with very narrow streets and no place for kids to play, but that "kids were welcome to visit."  Tester Bravo Depo., p. 93; Michelsen Decl., Ex. K, p. 17.  After taking a moment to search his "lists," he came back and provided more information about the home, including the number of bedrooms, general layout, homeowner fees, acreage, square footage, and that it is in a "nice quiet community."  Michelsen Decl., Ex. K, p. 17.  He then inquired as to whether they had any pets, noting that he knew of no pet restrictions, and where they were living at the moment.  *Id*, p. 17-18.  Tester Bravo responded that they lived in Portland but wanted to move to Southern

14 - FINDINGS AND RECOMMENDATIONS

Oregon since she was retiring and her husband would be working in Grants Pass.  *Id*.  In response, Jim mentioned that the house was "easy to show," a good deal, and the only one available in the Brookside Village community.  *Id*.  He also mentioned that their price range of $172,000 might limit them and that other homes in the area would likely be in the "older parts of Grants Pass or Medford" and "might not be the kinds of homes they were looking for."  *Id*.  He said he was happy to help them find something and offered to use his program to search for their price range daily to "give [you] an idea of what's available."  *Id*.  Tester Bravo said she would have to check with her husband's schedule about seeing the Brookside Village home, to which Jim responded "yeah, do that," adding again that he would be happy to show the home.  *Id*.  She then thanked him and ended the conversation at 12:15 pm.  *Id*.

James Ward remembers speaking only to one person who was retiring and moving to the area, and does not recall the date of that conversation or otherwise recall the content.  J. Ward Depo., p. 41.  He ceased being a realtor sometime in 2007.  J. Ward Depo., pp. 14-15.

On May 6, 2008, FHCO sent a letter to Bradley Realty, advising that it had violated the FHAA, requesting that it agree to various terms, demanding the payment of damages and attorney fees, and requesting a response by June 15, 2008.  Good Decl., ¶ 14, Ex. 1.  FHCA did not receive a favorable response.  *Id.*

After the allegedly discriminatory acts were brought to Bradley Realty's attention, it required all of its agents to take FHAA training to ensure a similar situation would not occur in the future.  T. Ward Depo., pp. 12-14, 20, 25.  Bradley Realty also displays the equal housing opportunity logo in its office, on its business cards, and on its website.  *Id*, pp. 20, 33, 35.

///

///

15 - FINDINGS AND RECOMMENDATIONS

## FINDINGS

FHCO alleges that by enforcing various rules and policies that prohibited children under the age of 18 from living in the development and restricting the use of common facilities by children, Brookside Village engaged in familial-status discrimination.  Complaint, ¶ 10.  FHCO also alleges that sometime in November 2006, Bradley Realty engaged in familial-status discrimination by listing and advertising Jones' home in Brookside Village as being in an "adult" community and telling a tester posing as a buyer with minor children that Brookside Village was an adult community for persons over the age of 18.   *Id*, ¶¶ 8, 12, 16.

Brookside Village and Bradley Realty seek summary judgment on two grounds.  First, they argue that FHCO lacks standing to bring suit against them.  Second, even if FHCO has standing, they argue that Brookside Village qualifies as a community reserved to "persons age 55 and older" as defined by an exemption to the FHAA.  If so, then Brookside Village and Bradley Realty contends that they did nothing to violate the FHAA.

As an initial matter, the parties have made various evidentiary objections to some of the exhibits submitted as part of the summary judgment record.  After carefully considering these objections, the court admits Exhibits 9 and 10 and the portions of the Harris Affidavit (docket #110-3) explaining those exhibits.  Exhibit 9 is admitted pursuant to the catch-all hearsay exception, FRE 807, and Exhibit 10 is admitted under the business record exception to the hearsay rule.  To the extent that these exhibits lacked sufficient foundation or there was any doubt about whether they were based on Harris' personal knowledge, those defects have been cured by the Supplemental Harris Affidavit (docket #138).  In the interest of brevity, the court declines to strike the Stark Affidavit (docket #143, Exhibit cc)  Rather than separately ruling on the remaining evidentiary objections, the court will not consider any inadmissible evidence in

considering the pending motions.

## I.     <u>Standing</u>

Both Bradley Realty and Brookside Village seek summary judgment on the basis that FHCO lacks standing to sue them.  To establish Article III standing to bring an action in federal court, a plaintiff must meet three requirements:  (1) the plaintiff must have suffered an "injury in fact," which is an invasion of a legally protected interest that is both "concrete and particularized," and "actual or imminent;" (2) a causal connection must exist between the injury and the alleged conduct; and (3) it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Walker v. City of Lakewood*, 272 F3d 1114, 1123 (9th Cir 2001), *cert denied*, 535 US 1017 (2002), quoting *Lujan v. Defenders of Wildlife*, 504 US 555, 560-61 (1992) (internal quotation omitted).   It is well-established that an organization has standing if it satisfies the same three requirements as for individuals.  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F3d 1083, 1088 (9th Cir 2010); *American Fed'n of Gov't Employees Local 1 v. Stone*, 502 F3d 1027, 1030 (9th Cir 2007).

### A.     <u>Injury and Causation</u>

To have standing to sue under the FHAA, a fair housing organization must have suffered "a distinct and palpable injury" as a result of the discriminatory housing practice.  *Havens Realty Corp. v. Coleman*, 455 US 363, 372 (1982).   "[C]oncrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's activities – constitutes far more than simply a setback to the organization's abstract social interests" and is sufficient to establish standing.  *Id* at 379.

The Ninth Circuit has interpreted this injury causation requirement to mean that an organization has "direct standing to sue [when] it show[s] a drain on its resources from both a

diversion of its resources and frustration of its mission" as a result of the defendant's conduct. *Fair Housing of Marin v. Combs*, 285 F3d 899, 905 (9th Cir), *cert denied*, 537 US 1018 (2002) ("*Combs*"). An organization "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociation de Trabajadores de Lake Forest,* 624 F3d at 1088. However, the requisite injury may be established by a diversion of resources "to investigating and other efforts to counteract [the defendant]'s discrimination above and beyond litigation." *Combs,* 285 F3d at 905. Recently, the Ninth Circuit held that a fair housing organization had standing to sue under the FHAA where, prior to commencing litigation, it had investigated an online roommate-matching website based on unlawful characteristics and "started new education and outreach campaigns targeted" at that particular discrimination. *Fair Hous. Council of San Francisco Valley v. Roommate.com, LLC*, 666 F3d 1216, 1219 (9th Cir 2012) ("*Roommate.com.*"). The court reached that conclusion because the defendant's discriminatory conduct had caused the organization "to divert resources independent of litigation costs and frustrated their central mission." *Id*.[5]

One of FHCO's stated purposes is to "promote equal opportunity in the renting, purchasing, financing, and advertising of housing," through, among other things, investigation of alleged discrimination, conducting testing to determine if equal opportunity housing is provided, providing outreach and education regarding fair housing, and "taking such steps as it deems necessary" to assure equal access to housing and to counteract the discriminatory effects of

---

[5] In his dissent, Judge Ikuta persuasively argues that this conclusion "brings the strain between our case law and Supreme Court precedent close to a rupture" by "drift[ing] away from the requirement that an organization actually suffer an injury." *Roommate.com,* 666 F3d at 1225-26. He reasons that investigating and addressing online discrimination is not a diversion of resources, but "a voluntary redirection of more resources to areas where there were more housing problems," which "represents adaptive and savvy organizational management, not injury." *Id* at 1226-27.

discriminatory housing practices.  Complaint, ¶ 5.  FHCO alleges that defendant's conduct has frustrated its ability to:  (1) work with landlords, realtors, listing services, and rental agencies in a "neutral and trusting relationship" as a result of "being forced to litigate these claims" (*id*, ¶ 20); and (2) "carry out its purpose and serve the public in its efforts to ensure decent rental housing for persons regardless of familial status" and its "ability to assure rights to the important social, professional, business, economic, and political benefits of those associations that arise from living in a community tolerant of and integrated with families with children" (*id*, ¶ 21).

Based on these allegations, FHCO easily satisfies the first "frustration of mission" requirement for organizational standing.  "Any violation" of the relevant accessibility law constitutes a frustration of the mission of a fair housing organization.  *See Smith v. Pacific Properties and Develop. Corp.*, 358 F3d 1097, 1105 (9th Cir), *cert denied*, 543 US 869 (2004). In addition, FHCO has submitted evidence that its mission of increasing "equal opportunity for housing choice" has been allegedly frustrated by defendants "restrict[ing] the ability of families with children to rent or buy homes in Brookside Village," which is one of "the more affordable developments in Rogue River."  Michelsen Decl., Ex. V ("Good Decl."), ¶ 15.[6]

The more difficult issue is whether FHCO has submitted sufficient evidence to support the other half of the standing requirement that defendants' actions have required it to "divert resources, independent of this litigation, which it would have spent in other ways."  *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F3d 936, 943 (9th Cir 2011), *cert denied*, 132 S Ct 1566 (2012).  FHCO alleges that it has suffered economic losses and diversion

---

[6] Bradley Realty objects to nearly all of the relevant paragraphs of the Good Declaration for several reasons, including that they are conclusory, speculative, and fail to separate out the resources spent or estimated to be spent in addressing the two defendants' separate and distinct conduct.  It would have been more useful had FHCO separated out the costs incurred investigating the two defendants and better identified which defendant's conduct necessitates which future expenditures.  However, for purposes of evaluating standing, the declaration is admissible.

of resources in the form of staff pay and direct expenses to investigate defendants' conduct, recruit and train testers, and design and administer tests (Complaint, ¶ 19), which has rendered it unable "to undertake other efforts to end unlawful housing practices" and requires it to expend future resources for "significant education and outreach in the community to ameliorate the effects of [d]efendants' actions" (*id*, ¶ 22).

Adding specificity to these allegations, Moloy Good, FHCO's Litigation Director, states that FHCO has incurred $4,910.00 in staff pay and training and payment of the testers, which was necessary to "determine[e] that this matter was going to require litigation." Good Decl., ¶ 13, Ex. 3, p.1. This reallocation of resources would have purchased 4,000 brochures or paid for 15 educational trainings. *Id*. Good also estimates future damages of $177,800.00, which includes a remediation campaign to be implemented once this litigation is over and funding is available. *Id*, ¶¶ 17, 20-21, Ex. 3; Good Depo., p. 48. In order to be most effective, this campaign will include: (1) two fair housing trainings a year in the Rogue River Area for ten years, one for housing providers and one for housing consumers; (2) significant promotion prior to each training; (3) ten years of continued fair housing testing to ensure compliance; (4) updated and specifically designed brochures focusing on familial status; (5) revising and refocusing the Rogue River trainings to include familial status discrimination; and (6) advertising to target familial status discrimination. Good Decl., ¶¶ 17-19; Good Depo., pp. 54, 56, 115.

Defendants contend that these damages are not sufficient to satisfy Article III's standing requirements. FHCO's staff spent less than eleven hours investigating both Brookside Village and Bradley Realty. Paradis Aff., Ex. 6 (time sheets showing 10.1 hours of staff time); Good Decl., ¶ 13, Ex. 3, p. 1 (damages estimate reflects 10.7 hours of staff resources spent on investigation). In addition, it only paid two testers, who were already trained, contacted local

real estate companies in Rogue River, filed this lawsuit, and considered future education efforts in Southern Oregon, which it already does to some degree. By seeking reimbursement of its daily operating expenses, litigation costs, and undefined future damages, defendants contend that FHCO has not suffered any "injury in fact."

In support, defendants rely on two similar cases. First, in *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F3d 71 (3rd Cir 1998), the staff members of a fair housing organization reviewed classified advertisements placed in newspapers. The organization alleged that it suffered an injury by diverting resources from counseling and other services in order to launch a remedial educational campaign, conducting an investigation to determine the extent of such discrimination in ongoing advertising, and commencing litigation. The Third Circuit held the organization lacked standing for several reasons. First, it found no causal connection between the advertisements and the need for a remedial education campaign based on a lack of evidence that any member of the public was denied or deterred from seeking housing or even made any complaint about the advertising. Second, the organization did not actually implement a remedial educational effort, but only estimated future costs of $400,000.00 for advertisements and mailings. Third, the review by existing staff members of newspapers for discriminatory advertisements was neither triggered by the defendant's conduct nor continued for longer than it would have otherwise.

Second, in *North Dakota Fair Housing Council v. Allen*, 319 F Supp2d 972, 977 (D ND 2004), a fair housing organization alleged that it had spent approximately $6,000.00 in staff time and out-of-pocket expenses to conduct interviews of former tenants and employees, counsel the defendants' alleged victims, mail letters to nearly 200 former tenants, disseminate a public service announcement, and distribute fair housing information to potential victims and across the

state.  The court concluded that these efforts, which consisted primarily of public service announcements and dissemination of educational materials, were not clearly traceable to the defendants' alleged misconduct, were not targeted solely at defendants' wrongdoing, and were designed to benefit the community as whole.  Because its ability to carry out its mission was not frustrated or otherwise negatively impacted by the defendants' actions, the court held that the organization had not suffered an injury-in-fact necessary to establish organizational standing.

FHCO distinguishes these cases by arguing that if the triggering event is not complaint-based, but instead is part of the organization's "business as usual," then there might not be as strong a case for standing.  In contrast, it argues that standing clearly exists where, as here, the investigation is triggered by a complaint, which then requires the organization to divert resources to investigate and remediate the discriminatory practice that triggered the complaint.  Although this approach draws a convenient line of demarcation, even the Third Circuit declined to resolve standing solely on this basis.   Moreover, it is illogical to differentiate between the manner in which discrimination comes to the attention of a fair housing organization.  Instead, the critical issue is whether the organization has diverted organizational resources away from counseling, education, and other efforts to combat discrimination in housing and has not simply manufactured litigation as a way to spend its resources.

FHCO began investigating Brookside Village or Bradley Realty sometime in November 2006 after receiving a complaint of familial-status discrimination.  It then expended resources to investigate that complaint, which, at a minimum, included staff time to research the alleged discrimination, devise a plan, and create and coordinate the tests.  Those efforts also presumably included contacting the testers, advising them about their task, compensating them for their time, reading their reports, and based on the information deduced, deciding on a plan of action.  FHCO

estimates that its "past diversion of resources" breaks down to $1,721.00 in staff expenses, $60.00 to pay the testers, and $2,448.00 for tester training and recruitment.   Good Decl., Ex. 3, p. 1.

Some of those pre-litigation costs, particularly the $2,448.00 in tester training and recruitment, appear excessive in light of the fact that the particular testers were already trained. However, this does not obviate the need for reimbursing FHCO for the cost of at least some training.  Furthermore, time and money spent investigating potential discrimination do not negate standing simply because they relate to the development of a lawsuit.  They also can be regarded as an independent activity associated with the identification and counteraction of the defendants' discriminatory practices.  Admittedly, the amount of investigation costs incurred by FHCO is small, but standing does not require a minimum amount of resources to be diverted from counseling and referral to litigation.   It is troublesome that FHCO appears to have opted for litigation very quickly after sending demand letters, rather than focusing on a less confrontational approach to resolve the issue.  However, standing does not rest on the tactics used to counter housing discrimination, as long as it does not rest solely on litigation costs.

FHCA also relies on estimated costs for remedial educational outreach and enforcement. These costs seem quite high, especially in light of the proposed broad outreach to all of Southern Oregon, rather than to the affected Rogue River area, and for such an extended period of time. However, the Ninth Circuit requires only that an organization establish that it must divert resources to counteract the problem caused by the defendant's discriminatory practices.  *Combs*, 285 F3d at 905.   FHCO has done so.

23 - FINDINGS AND RECOMMENDATIONS

Thus, this court concludes that FHCO has demonstrated that it suffered an injury as a result of defendants' allegedly discriminatory housing practices sufficient to establish "a sufficient organizational injury for standing purposes." *Redondo Beach*, 657 F3d at 943.

**B.      Redressability**

Even if FHCO has established sufficient injury, Brookside Village and Bradley Realty argue that it fails to satisfy the third standing element of redressability for two reasons:  (1) there is no pervasive pattern of discrimination to warrant injunctive relief, and (2) any economic damages caused by them have already been satisfied by the damages previously paid in settlement by the other defendants.

Bradley Realty asks the court to find, as a matter of law, that FHCO has failed to establish that it engaged in a pattern or practice of discrimination.  In support, it cites several cases holding that, while courts have discretion in awarding injunctive relief in FHAA cases, such relief is appropriate only where there is a risk of subsequent violations or such relief is necessary to reform the defendant's behavior.  *See Lewis v. Casey*, 518 US 343, 359 (1996); *Armstrong v. Davis*, 275 F3d 849, 870 (9th Cir 2001), *abrogated on other grounds*, *Harris v. Alvarado*, 402 Fed Appx 180 (9th Cir 2010); *U.S. v. Balistrieri*, 981 F2d 916, 933-34 (7th Cir 1992); *Ambruster v. Monument 3: Realty Fund VIII Ltd.*, 963 F Supp 862, 866 (ND Cal 1997); *Simovits v. Chanticleer Condominium Assoc.*, 933 F Supp 1394, 1407-08 (ND Ill 1996). According to Bradley Realty, injunctive relief is not appropriate because it has reformed by adopting a policy of non-discrimination, requiring FHAA training for all its brokers and displaying equal opportunity information on all its materials.  It also contends that the amount of

potential damages is minimal[7] and clearly exceeded by the amount of monetary damages that FHCO has received in settlement from other defendants.  Because any amounts owed to FHCO for its efforts to investigate Bradley Realty have already been satisfied, it asserts that additional compensatory damages are unavailable to FHCO.  Brookside Village also argues that because it is qualifies as a community reserved to "persons age 55 and older" as defined by an exemption to the FHAA, it is not responsible for any damages flowing from its alleged violations.

None of the cases cited by defendants stands for the principle that when evaluating standing, the court must determine whether damages would actually be appropriate and recoverable.  Standing only requires that it be "likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Lujan*, 504 US at 561 (citation omitted). Once a court has found that a violation of the FHAA has occurred, it "has broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs."  *Southern Cal. Hous. Rights Ctr. v. Krug*, 564 F Supp2d 1138, 1145 (CD Cal Oct 15, 2007).   FHCO has requested monetary relief for its past and future costs, injunctive relief to prevent defendants from committing discriminatory acts in the future, and declaratory relief barring advertising of Brookside Village as a 55 and older community.  Complaint, ¶ 24, pp. 13-17.   Such relief is permitted under the FHAA.  42 USC § 3613(c).

Even though FHCO seeks relief permitted by the FHAA, it has failed to satisfy the "redressability" prong as to Bradley Realty.   Standing is determined at the date a plaintiff files suit.  *Lujan*, 504 US at 571 n5.  When this action commenced in November 2008, Bradley Realty was largely in compliance with all the affirmative injunctive relief requested by FHCO.  Bradley

---

[7]  Bradley Realty estimates that it is liable, at most, for $152.50, which reflects the payment of the two testers and .75 hours of staff time.  Memorandum in Support of  Motion for Summary Judgment (docket #105), p. 26.

Realty's underlying conduct occurred in 2006 and 2007; the offending advertisement was noticed and changed before the Property sold; and in 2008, Teresa Ward adopted an office policy requiring all her brokers to attend fair housing training. Bradley Realty has always displayed the fair housing logo on all of its materials. At the time of filing, Bradley Realty had not yet provided FHCO with the contact information of any person who had been steered away from Brookside Village due to familial status. However, during discovery, Bradley Realty did provide information regarding the number of Brookside Village homes it listed, advertised, and sold since 2004. Michelsen Decl., Ex. Z, pp. 2-3. At oral argument, FHCO pointed out that Bradley Realty published an advertisement in February 2008 advertising a mobile home park as an "adult park." *Id*, Ex. Y. There is no evidence in the record that the mobile home community was not an FHAA-exempt community. But even assuming it was not, by FHCO's own admission, Bradley Realty has ceased publishing advertisements using such language since that advertisement was published nine months before this lawsuit was filed.

Thus, even if Bradley Realty violated the FHAA by way of its advertisements and communications about Brookside Village in 2006, it has since taken affirmative steps to correct this behavior and prevent it from occurring in the future. Consequently, at the time FHCO filed its lawsuit, Bradley Realty had largely reformed its practices in order to guard against any further discriminatory action, thereby undermining the justification for injunctive relief. *See e.g., Armstrong*, 275 F3d at 870; *Balistrieri*, 981 F2d at 933-34. Moreover, any compensatory damages for which Bradley Realty could be liable are minimal and have already been satisfied by settlement payments by the other defendants who were sued jointly and severally. Thus, FHCO has not established that the injury it suffered as a result of Bradley Realty's conduct will "likely" be "redressed by a favorable decision." *Lujan*, 504 US at 561.

26 - FINDINGS AND RECOMMENDATIONS

In contrast, FHCO has satisfied the redressability prong with regard to Brookside Village. If, as FHCO alleges, Brookside Village impermissibly engaged in familial status discrimination, then FHCO's requested affirmative injunctive relief, which includes compliance with the FHAA and modifying all rules, regulations, advertisements, and publications to include a statement that Brookside Village is open to people of all ages, may well be appropriate to correct any past wrongs. Even if Brookside Village at some point became exempt from the FHAA as a 55 and older community, for purposes of standing, FHCO has established that Brookside Village's allegedly illegal conduct prior to that time will "likely" be "redressed by a favorable decision." *Id*.

In sum, FHCO has established that it has standing to bring this action against Brookside Village. However, it lacks standing to sue Bradley Realty for failure to allege any redressable injury by Bradley Realty. Accordingly, Bradley Realty's motion for summary judgment should be granted, and a judgment should be entered dismissing all FHCO's claims against it.

## II.  <u>Housing Discrimination Claims</u>

### A.    <u>HOPA Exemption</u>

Under the FHAA, it is unlawful to engage in any of the following:

> (a)  To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . familial status.
>
> (b)  To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . familial status.
>
> (c)  To make, print or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . familial status . . . or an intention to make any such preference, limitation, or discrimination.

> (d) To represent to any person because of . . . familial status . . . that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

42 USC § 3604 (a)-(d).

"Familial status" refers to the presence of minor children residing in the household.

42 USC § 3602(k); *City of Edmunds v. Oxford House, Inc.*, 514 US 725, 728 n1 (1995).

The Supreme Court considers the language of the FHAA "broad and inclusive." *Trafficante v. Metro. Life Ins. Co.*, 409 US 205, 209 (1972).  According to the Ninth Circuit, the FHAA must be given "a generous construction in order to carry out a policy that Congress considered to be of the highest priority."  *United States v. California Mobile Home Park Mgmt. Co.*, 29 F3d 1413, 1416 (9th Cir 1994), quoting *Trafficante*, 409 US at 211 (internal quotation omitted).  Because the FHAA is a "broad remedial statute," any exemptions to the prohibition on discrimination based on familial status must be construed narrowly.  *City of Edmonds v. Washington State Bldg. Code Council*, 18 F3d 802, 804 (9th Cir 1994), *aff'd*, 514 US 725 (1995) (citations omitted).

To establish a familial status claim under the FHAA, a plaintiff must present evidence that:  (1) defendant made a statement, (2) with respect to the sale or rental of a dwelling, and (3) indicating a preference, a limitation, or discrimination against the plaintiff on the basis of their status as a parent.  *U.S. v. Hadlock*, Civil No. 08-3074-CL, 2010 WL 331772, at *4 (D Or Jan 27, 2010), citing *White v. U.S. Dep't of Hous. and Develop.*, 475 F3d 898, 904 (7th Cir 2007); 42 USC § 3604(c).

FHCO alleges that Brookside Village violated 42 USC § 3604 (a) and (c) by making various statements restricting residency at Brookside Village to adults and otherwise making distinctions between people with or without children.  In addition, FHCO alleges that Brookside

28 - FINDINGS AND RECOMMENDATIONS

Village violated 42 USC § 3604 (b) by including discriminatory statements in its past rules, regulations, and Directory and by prohibiting skateboards and restricting use of the pool. Brookside Village responds that it may discriminate based on familial status because it qualifies as a community reserved to "persons age 55 and older" as defined by an exemption to the FHAA.[8]

FHCO also alleges that Brookside Village violated various provisions of ORS 659A.421, Oregon's fair housing statute. The parties appear to agree that this statute may be interpreted consistently with the FHAA. *See*, *e.g.*, *McGary v. City of Portland*, 386 F3d 1259, 1270-71(9th Cir 2004) (reversing the district court's reasoning for claims arising under state law since the court based its reasoning on these claims on an erroneous interpretation of the FHAA). The two statutes do not directly track each other, but guard against the same conduct.[9] Consequently, for purposes of this motion, the state and federal fair housing claims will be considered together.

---

[8] Because FHCO has no standing to sue Bradley Realty for housing discrimination, this court need not address whether Bradley Realty engaged in any conduct that violated the FHAA.

[9] By way of reference, pursuant to ORS 659A.421, it is unlawful to engage in the following, based upon, among other things, familial status:

(a) Refuse to sell, lease or rent any real property to a purchaser.
(b) Expel a purchaser from any real property.
(c) Make any distinction, discrimination or restriction against a purchaser in the price, terms, conditions or privileges relating to the sale, rental, lease or occupancy of real property or in the furnishing of any facilities or services in connection therewith.
(d) Attempt to discourage the sale, rental or lease of any real property to a purchaser.
(e) Publish, circulate, issue or display, or cause to be published, circulated, issued or displayed, any communication, notice, advertisement or sign of any kind relating to the sale, rental or leasing of real property that indicates any preference, limitation, specification or unlawful discrimination based on [a variety of characteristics, including familial status].
(f) Assist, induce, incite or coerce another person to commit an act or engage in a practice that violates this section.
(g) Coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of the person having exercised or enjoyed or having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this section.
(h) Deny access to, or membership or participation in, any multiple listing service, real estate brokers' organization or other service, organization or facility relating to the business of selling or renting dwellings, or discriminate against any person in the terms or conditions of the access, membership or participation.

Whether Brookside Village violated the FHAA and ORS 659A.421 depends on whether it is qualified under the Housing for Older Persons Act ("HOPA") "55 and older" exemption. FHCO takes the position that Brookside Village fails to meet the requirements of this exemption because it failed to continuously maintain 80% occupancy of persons age 55 or older prior to engaging in familial status discrimination. According to FHCO, Brookside Village has engaged in familial status discrimination since it opened in 1977, did not demonstrate an intent to operate as a 55 and older community until 2008, and still has failed to satisfy the regulatory requirements necessary to claim the HOPA exemption.

When Congress enacted the FHAA in 1988, it added a prohibition of discrimination on the basis of familial status, but also added two exemptions, including one for "housing for older persons." 42 USC § 3607(b)(1); *Putnam Family P'ship v. City of Yucaipa*, 673 F3d 920, 925-27 (9th Cir 2012) (discussing the legislative history surrounding the exemption). This exemption, later known as the "senior exemption," was promulgated because Congress recognized that the law would impact people who already had property in existing retirement communities and sought to "permit[ ] communities satisfying certain requirements to discriminate on the basis of familial status." *Putnam*, 673 F3d at 925 (citation omitted); *Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F3d 1472, 1476 (11th Cir 1993), *cert denied*, 513 US 808 (1994) (discussing the adoption of the senior exemption). Congress set forth the minimum requirements for the senior exemption, but directed the Department of Housing and Urban Development ("HUD") to promulgate regulations regarding how to determine whether housing qualifies as exempt. 42 USC § 3607(b)(2)(C) (1988). In 1995, Congress passed HOPA, which amended the

---

(i) Represent to a person that a dwelling is not available for inspection, sale or rental when the dwelling in fact is available for inspection, sale or rental.
(j) Otherwise make unavailable or deny a dwelling to a person.

30 - FINDINGS AND RECOMMENDATIONS

requirements for the senior exemption in order to "mak[e] the law clearer and more workable"

and "easier for a housing community of older persons to determine whether they qualified for the

[senior] exemption."  IMPLEMENTATION OF THE HOUSING FOR OLDER PERSONS ACT OF 1995, 64

Fed Reg 16324, 16325 (Apr. 2, 1999).

      Housing qualifies for the HOPA exemption when it is "intended and operated for

occupancy by persons 55 years of age or older" and satisfies all of the following requirements:

> (i) at least 80 percent of the occupied units are occupied by at least one
> person who is 55 years of age or older;
>
> (ii) the housing facility or community publishes and adheres to policies
> and procedures that demonstrate the intent required under this
> subparagraph; and
>
> (iii) the housing facility or community complies with rules issued by the
> Secretary for verification of occupancy, which shall:
>
>> (I) provide for verification by reliable surveys and affidavits; and
>>
>> (II) include examples of the types of policies and procedures
>> relevant to a determination of compliance with the requirement of
>> clause (ii).  Such surveys and affidavits shall be admissible in
>> administrative and judicial proceedings for the purposes of such
>> verification.

42 USC § 3607(b)(2)(C) (1995).

      The current HOPA regulations became effective on May 3, 1999.  64 Fed Reg at 16326.

Also in 1999, HUD published final regulations implementing HOPA.  24 CFR §§ 100.304 –

100.308; *Balvage v. Ryderwood Improvement and Serv. Ass'n, Inc.*, 642 F3d 765, 770 (9th Cir

2011).  Communities that did not meet the requirements for the HOPA exemption on May 3,

1999, could take advantage of a one-year transition period ending May 3, 2000, to try and

become HOPA compliant.  64 Fed Reg at 16324; 24 CFR § 100.305(e)(5).  This transition period

allowed communities to meet the 80% occupancy requirement by reserving unoccupied units for

persons 55 years or older and legally discriminating against families with children, if they

demonstrated an intent to be HOPA housing and complied with the verification requirement, as

required by 42 USC § 3607(b)(2)(C)(ii) and (iii).  After the end of the transition period, if the

community had failed to establish the 80% occupancy requirement, then it could no longer

reserve unoccupied units or otherwise discriminate against families.

However, "[t]he regulations did not address how an existing community could obtain

exempt status after expiration of the transition period." *Balvage*, 642 F3d at 772.  The Ninth

Circuit resolved this issue by holding that:

> a residential community that has continuously operated as a retirement
> community for persons age 55 and older can qualify for the housing for older
> persons exemption from the Fair Housing Act's prohibition on familial status
> discrimination by establishing that it *currently* satisfies the exemption's three
> statutory and regulatory criteria at the time of the alleged violation, even if the
> community enforced age restrictions when it first achieved compliance with the
> exemption's age verification requirement.

*Id* at 768-69 (emphasis in original).

Specifically, it adopted the reasoning articulated in an amicus brief submitted by HUD,[10]

which explained that the issue presented was "how a community that has consistently maintained

the 80% threshold but has failed to comply with HOPA's age-verification requirements can

come into compliance with HOPA and take advantage of HOPA's affirmative defense going

forward."  *Id* at 780.  The district court had erred because it had relied on a 2006 Policy

Guidance Statement from HUD which concerned a different situation, namely how "a

community that had *not reached* the 80% threshold by the end of the transition period could

convert to housing for older persons and take advantage of the HOPA exemption."  *Id* (emphasis

added).   In other words, a continuously operated retirement community for persons age 55 and

---

[10]  Brookside Village has submitted a copy of this brief as an attachment to its memorandum (docket #124-1).

older can comply with the HOPA exemption on a prospective basis at any time regardless of past actions, but will be held liable for any familial status discrimination before it achieved compliance.  *Id* at 779-80.  The HOPA exemption is an affirmative defense for which a defendant has the burden of proof.  *Id* at 776.  Thus, a defendant must prove that all elements of the exemption were met at the time of the alleged violation.  *Id.*

The parties disagree as to whether Brookside Village reached HOPA's 80% occupancy requirement because of discrimination when the transition period closed on May 3, 2000, and if so, whether it is barred from ever becoming HOPA compliant.  FHCO argues that Brookside Village cannot establish that it has ever satisfied all three requirements of the HOPA exemption because it engaged in familial status discrimination in order to become compliant.  Brookside Village responds that, pursuant to *Balvage*, it may still qualify for the HOPA exemption, even though it has engaged in familial status discrimination after the close of the transition period.  Consequently, the court must first determine if, by the end of the HOPA transition period on May 3, 2000, Brookside Village met the 80% requirement, and thus, like the community in *Balvage*, it has "continuously operated as a retirement community for persons age 55 and over." 642 F3d at 768-69.  Then, the court must determine, when, if ever, Brookside Village satisfied all three criteria to qualify for the HOPA exemption "notwithstanding the fact that it may have engaged in familial status discrimination after the transition period and prior to establishing compliance with HOPA's [statutory requirements]."  *Id* at 779.  This analysis tracks 42 USC § 3607(b)(2)(C) which requires that a community must be "intended and operated for occupancy by persons 55 years of age or older" *and* satisfy all three statutory requirements.

///

///

33 - FINDINGS AND RECOMMENDATIONS

B.    <u>**Continuously Operating Retirement Community**</u>

First, the court must determine if Brookside Village met the 80% occupancy requirement by the close of the transition period, thereby establishing that it is a community "intended and operated for occupancy by persons 55 years of age or older." 42 USC § 3607(b)(2)(C). The Ninth Circuit's analysis in *Balvage* is instructive in this regard. The community in that case had "continuously operated as housing for persons 55 and over" as evidenced by the facts that: (1) when it was established in 1953, it restricted ownership to persons "who are bona fide recipients of a pension or retirement annuity;" and (2) in 1975, its homeowners' association amended its Bylaws to specifically restrict residency to those age 55 and older. 642 F3d at 773.

Here, Brookside Village has continuously operated as an adult community, as evidenced by the facts that: (1) its CC&R, which are still in effect, prohibit occupancy to those under age 18; and (2) it held itself out as a community for "adults" or as an "adult community" in all of its written materials and on a sign at the entrance to the community until June 2008. The terms "adult" or "adult community" can imply that the community is restricted only to adults age 55 and over. However, those terms also may reasonably be interpreted to mean that the community impermissibly discriminates against families with children, as alleged by FHCO.

Beginning in 2003, Brookside Village considered converting to a 55 and over community, but failed to do so. Sometime in 2006, FHCO learned that at least one family, the Andersons, had been told to leave Brookside Village because their child was under the age of 18. After FHCO received this complaint, FHCO examined Brookside Village's founding documents, the CC&R and Bylaws, as well as other materials that contained rules and regulations that seemed targeted toward prohibiting children. It then sent Brookside Village letters dated May 6 and June 9, 2008, stating that it was violating both Oregon and federal fair housing laws by

holding itself out as being only for adults and demanding that it comply with various terms and conditions.

Beginning in June 2008 in response to those demand letters, Brookside Village amended its Bylaws to become a "55 years old and older community," adopted a written "55 and Older Policy," changed the entrance sign to "Brookside 55+ Village," and began sending letters to its residents about the change. FHCO filed this lawsuit on November 21, 2008. By that time, Brookside Village had already begun the process of formally changing the way it referred to itself from "adult community" to a "55+ community."[11]

After this lawsuit was filed and in order to prove that Brookside Village has, in fact, always operated as a retirement community, f Harris conducted an analysis to establish that Brookside Village indeed met the 80% occupancy requirement at the end of the transition period on May 3, 2000, and has consistently maintained this threshold in the years since. Harris Aff., pp. 4-5. Harris began her analysis by reviewing the Brookside Village Directory for 2000-01, which is a business record kept in the ordinary course of the Board's activities. *Id*; Supp. Harris Aff., pp. 1-2. She used the Directory to make a list of the residents who were residing in Brookside Village at the time the Directory was published in 2000. Harris Aff., pp. 4-5. She then used various people-finder websites to determine the residents' ages in 2000, ultimately concluding that 76 of 80 residences (95%) were occupied by at least one person who was at least 55 years old. *Id*. Mary Alice Spooner (docket #140), a homeowner since 1989, confirms Harris's conclusion by listing 11 residents of Brookside Village in mid-2000 who, based on her personal knowledge, were all well over the age of 55 at that time. Spooner Decl. (docket #140), pp. 1-2.

---

[11] Although not revealed by the record, FHCO likely filed its lawsuit because it was unaware of Brookside Village's efforts to comply with the HOPA exemption.

Harris then determined whether any of these residents were currently living in Brookside Village and double-checked these individuals' ages against the 2009 age-verification survey she had conducted.   Harris Aff., p. 5.  She was able to identify those residents still residing at Brookside Village based on her own personal knowledge and by referring to most recent 2011-12 Directory.  *Id*; Supp. Harris Aff., pp. 2-3.

In order to undermine Harris' analysis, FHCO has submitted an affidavit from Nancy Stark, who lived in Brookside Village from November 2007 to March 2008.   Stark Aff. (docket #143, Exhibit cc), ¶ 17.   During the time that the Starks lived in Brookside Village, they noticed that "roughly half the people living near [them] were under the age of 55," and "there was a great deal of turnover in the development."  *Id*, ¶¶ 12, 18.  These statements are insufficient to overcome the more specific and reliable evidence provided by Brookside Village to establish that it achieved the 80% occupancy threshold by the end of the transition period.  Specifically, Stark's statement that the people living "near" them were not at least age 55 does not provide any information about what she meant by the word "near."  This word could reasonably be interpreted to refer to the entire 80-unit development, to just her street, or to the few houses that bordered her home.  Additionally, just because she observed people who appeared younger than age 55 living in the community does not mean that their households did not include someone age 55 or older.  Consequently, FHCO's evidence fails to create a genuine issue of material fact with regard to whether, at the close of the transition period on May 3, 2000, Brookside Village had met the 80% occupancy requirement.

Many of the same people who were at least 55 years old in 2000 still live in Brookside Village.  As a result, notwithstanding the ambiguous "adult community" language used prior to 2008, Brookside Village has, in fact, continuously operated as a retirement community for

persons age 55 and older in 2000 and afterwards. Consequently, even though Brookside Village engaged in discriminatory practices after 2000, it did not need to do so in order to meet the 80% occupancy requirement. Thus, it may avail itself of the HOPA exemption if it currently meets all three statutory requirements. *Balvage*, 642 F3d at 768-69. The court now turns to that issue.

      C.      <u>**Compliance with Statutory Requirements**</u>

           1.      <u>**80% Occupancy of Persons 55 and Older**</u>

First, HOPA requires a community claiming the HOPA exemption to show that "at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older." 42 USC § 3607(b)(2)(C)(i); 24 CFR § 100.305. Brookside Village contends that it has satisfied this requirement by way of the age-verification survey conducted in June 2009, which established that at least 80% of the units were occupied by residents 55 years of age or older. According to the August 11, 2009 Board minutes, which reported the survey results, the process was stopped once the 80% threshold was reached. Michelsen Decl., Ex. D, p. 27. A review of the surveys establishes that of the 77 homes surveyed, 67 had at least one occupant age 55 or older, five homes did not have an occupant that met the age requirement, and five homes were vacant. *Id*, Ex. R, pp. 79-155. Brookside Village conducted its next survey in June 2011, completing a form for 78 of the 80 homes in the development. *Id*, pp. 1-78. For 46 of the homes, the form is not signed by the resident, but instead the surveyor indicated that there was no change in the ownership or occupancy of the home and that the occupant was over age 55 at the time of the 2009 survey. *Id*. In addition, 21 forms affirmatively state that at least one occupant was age 55 or older. *Id*. The remaining 11 forms state that the homes were vacant. *Id*. Therefore, according to Brookside Village, it has

37 - FINDINGS AND RECOMMENDATIONS

established that at least 80% of the units were occupied by residents 55 years of age or older as of the time the June 2009 survey was completed.

FHCO disputes the sufficiency of the 2009 and 2011 surveys because Brookside Village did not maintain copies of the residents' documentation of their ages and otherwise does not keep demographic data on its residents. Since resolution of the issue of whether FHCO meets the 80% occupancy requirement is closely tied to the validity of the surveys conducted, resolution of this issue is discussed below in connection with the verification of occupancy requirement.

### 2.    Policies and Procedures of Intent

Second, the HOPA exemption requires a community to show that "the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent" to operate as a community for persons 55 or older. 42 USC § 3607(b)(2)(C)(ii); 24 CFR § 100.306. Brookside Village argues that it has satisfied this requirement since June 2008 when the Board amended its Bylaws and adopted a written "55 and Older Policy."

FHCO argues that since Brookside Village has always represented itself as an "adult community" and steered away families with children since its inception, it cannot establish that it had the intent to operate as a housing community for persons age 55 and older. It points to the facts that Brookside Village has not changed the discriminatory provision in the CC&R which restricts occupancy to adults age 18 and over and that the CC&R control over the conflicting 2008 changes to the Bylaws and subsequent conduct.

Brookside Village counters that the CC&R cannot be amended, but can only be terminated, and that it has taken several other actions to establish its intent to operate as housing for persons who are 55 years of age or older. Thus, it maintains that the failure to amend a single

discriminatory CC&R provision is not fatal to its ability to establish that it is HOPA-compliant.

This court agrees.  The regulations require that a community "publish and adhere to policies and

procedures that demonstrate its intent to operate as housing for persons 55 years of age or older,"

and lists several factors that are "relevant" to determining compliance with this requirement,

including the following:

> (1) The manner in which the housing facility or community is described to
> prospective residents;
> (2) Any advertising designed to attract prospective residents;
> (3) Lease provisions;
> (4) Written rules, regulations, covenants, deed or other restrictions;
> (5) The maintenance and consistent application of relevant procedures;
> (6) Actual practices of the housing facility or community; and
> (7) Public posting in common areas of statements describing the facility or
> community as housing for persons 55 years of age or older.

24 CFR §100.306(a).

The regulations also require that if there is "language in deed or other community or

facility documents" that is inconsistent with this intent, then HUD will "consider documented

evidence of a good faith attempt to remove such language in determining whether the housing

facility or community complies with the requirements . . . in conjunction with other evidence of

intent."  24 CFR §100.306(c).

Brookside Village's actions satisfied both the letter and spirit of the regulations.   On

June 25, 2008, the Board changed it is Bylaws to become a 55 and older community pursuant to

42 USC § 3607 and "to take the steps necessary to assure and enforce compliance."  Shortly

thereafter, Brookside Village adopted a written "55 and Older Policy."  Two days after the

Board's vote, Brookside Village repainted the sign to advertise the community as "Brookside

55+ Village."  Five days after the vote, the Board sent a letter advising all Brookside Village

homeowners of the conversion and need to comply.  Just a few months later, on October 14,

2008, Brookside Village changed its Rules to bar individuals under the age of 55 and also added a notice to the 2009-10 Directory.  This was followed by a notice on January 21, 2009, to the Grants Pass Daily Courier's classified advertising department and letters in April, May and June 2009 to all Brookside Village homeowners regarding their responsibilities when selling or renting their properties.  Then in June 2009, the Board began its first official survey to determine resident ages.

In light of all of the published policies and procedures that Brookside Village has adopted evidencing its clear intent to operate as 55 and older housing, the fact that it has not yet changed one provision of its CC&R does not doom its effort to establish the requisite intent.  As a result, , Brookside Village has satisfied HOPA's intent requirement.

### 3.    Occupancy Verification

Finally, the HOPA exemption requires that a community verify occupancy "by reliable surveys and affidavits."  42 USC § 3607(b)(2)(C)(iii)(I); 24 CFR § 100.307(a).  A community must verify the age of its occupants at least every two years; the verification procedures must encompass all the units; and the ages must be verified by reliable documents that provide specific information about current age or date of birth.  24 CFR § 100.307(a)-(e).   The Ninth Circuit has summarized the verification requirement as follows:

> To satisfy the requirement, a community must do more than collect some data over some period of time.  It must collect *complete* data for all residences.  The data must be *current* (as of the time of the verification).  And the community must *compile* the data:  the community must show that it actually used the data to verify that the community in fact satisfied HOPA's 80 percent occupancy requirement at the time of the verification.

*Balvage*, 642 F3d at 778 (emphasis in original).

FHCO contends that Brookside Village's surveys do not satisfy these requirements.  As noted above, Brookside conducted its first age-verification survey in June 2009.  A volunteer

went door-to-door in order to verify the occupants' ages.  The form used had boxes to check for

proof of age, which set forth all of the documents identified in 24 CFR § 100.307(d), and

directed the census taker to mark with an "X" the form of identification verified.  If no one

living in the unit met the age requirement, then the ages of the occupants were reported.

The census taker marked the form of identification verified and recorded the birth date of at

least one of the occupants.  Of the 77 forms completed as part of the 2009 survey, only two

of them did not include a birth date for one of the occupants, though one of them indicated

that the "age of tenant is 63."  Michelsen Decl., Ex. R, pp. 105, 147.

There is no evidence in the record that Brookside Village maintained copies of the

documentation somewhere.  However, the regulations do not require communities to keep this

type of documentation, but require only that a "summary of occupancy surveys shall be available

for inspection."  24 CFR § 100.307(h).  Brookside Village has submitted the copies of the

surveys to the court.  Thus, even if it does not otherwise maintain other demographic information

regarding its occupants, the summary survey results are sufficient for satisfying HOPA's age

verification requirement.   Consequently, the 2009 survey meets the requirement for a verified

survey.

The 2011 survey was performed in the same manner as the 2009 survey, but Roger

Harding, the Board member who conducted the survey, did not go back to those people who still

resided at Brookside Village and were at least 55 years old at the time of the 2009 survey.

However, he did complete a form for each of these residents, affirming that they were 55

years old at the time of the last survey and that the occupancy of that particular unit had not

changed.  Of the 78 surveys completed, 46 of them indicate no change in occupancy since

2009. For those residences with a change in occupancy, the form was completed in the same way as it had been in 2009.

FHCO objects to the 2011 survey as unreliable because Harding did not go to each residence and ask for identification again, contending that his reliance on the previous survey is only permissible under the regulations if the occupant "refuse[s] to comply." 24 CFR § 100.307(g). While this regulation does indeed pertain to the permissible procedures that a community may employ in order to verify the age of a resident who refuses to comply, nothing suggests that a community cannot rely on past surveys in order to update its verification records. In fact, the regulation requires only that a community "provide for regular updates through surveys or other means, of the initial information supplied by the occupants" and that such updates must occur at least every two years. 24 CFR § 100.307(c). Accordingly, the 2011 survey meets the requirement for a verified survey.

### D.    HOPA Compliance

Brookside Village has established that on and after the close of the transition period on May 3, 2000, it had continuously operated as a retirement community for persons age 55 and older. Brookside Village has also established that: (1) as of the completion of the first official age verification survey in June 2009, at least 80% of its occupied units are occupied by at least one person age 55 or older; (2) it has published and adheres to policies and procedures that demonstrate its intent to operate as a 55 and older community; and (3) it has provided sufficient verification of occupancy by way of reliable surveys. Accordingly, Brookside Village has satisfied all necessary requirements in order to meet the HOPA exemption as of June 2009 and cannot be liable for any familial status discrimination after June 2009.

However, Brookside Village may be liable for discrimination prior to June 2009 since "current compliance . . . will not shield a community from liability for discrimination occurring before compliance was achieved." *Balvage*, 642 F3d at 780. FHCO filed suit in November 2008 before Brookside Village reached full compliance. Accordingly, it may seek damages against Brookside Village for that period of noncompliance before June 2009 that falls within the two-year statute of limitations. 42 USC § 3613(a)(1)(A).

Consequently, Brookside Village should be granted summary judgment on all of FHCO's claims arising after June 2009 when it achieved compliance with the HOPA exemption. The next issue is whether FHCO can demonstrate that Brookside Village was in violation of the FHAA and corresponding Oregon statutes prior to June 2009.

### E.    Familial Status Discrimination Prior to June 2009

FHCO alleges that Brookside Village violated 42 USC § 3604 (a), (b), and (c) and ORS 659A.421 (c), (d), (e), and (j), by making various statements restricting residency in Brookside Village to adults and otherwise distinguishing between residents with or without children, by making discriminatory statements in its CC&R, Bylaws, Rules, and Directory, and by prohibiting skateboards and the restricting the use of the pool. Specifically, FHCO alleges that by having policies and rules in place that only allowed adults over the age of 18 to live in the community, by advertising and publishing that the community was for "adults," and by restricting the use of the facilities by children, it engaged in conduct that amounts to impermissible steering. 24 CFR § 100.70(a), (c). The prohibition on the use of the facilities by children is an impermissible limitation of the "privileges, services, or facilities associated with a dwelling" on the basis of familial status. 24 CFR § 100.65(b)(4). Finally, the discriminatory statements in Brookside Village's rules, regulations, CC&R, and Directory, are impermissible

because discriminatory deed restrictions may not be enforced or otherwise used to deny housing opportunities.  24 CFR § 100.80(b)(2).

Federal courts have recognized three general types of claims under the FHAA: (1) disparate treatment; (2) disparate impact; and (3) refusal to grant a protected person a reasonable accommodation.  *Hayden Lake Recreational Water & Sewer Dist. v. Haydenview Cottage, LLC*, 835 F Supp2d 965, 977-78 (D Id 2011).  FHCO does not explicitly distinguish between these three types of claims, but appears to bring a disparate treatment claim.

To prove a *prima facie* case for disparate treatment under the FHAA, the plaintiff must show that "a protected group has been subjected to explicitly differential – i.e. discriminatory – treatment."  *Community House, Inc. v. City of Boise*, 490 F3d 1041, 1050 (9th Cir 2007).  The challenged regulation or policy must be discriminatory on its face.  *Id* at 1048.  If the plaintiff proves a *prima facie* case of intentional discrimination, then the analysis then turns to the defendant's justification for the policy.  *Id* at 1051.  The defendant must show "either:  (1) that the restriction benefits the protected class or (2) that it responds to legitimate safety concerns raised by individuals affected, rather than being based on stereotypes."  *Id* at 1050.

Here, there is no doubt that Brookside Village has long had different rules and policies in place based on familial status.  The CC&R specifically exclude individuals under the age of 18 from residing at Brookside Village.  Until the 55 and older policy was adopted in June 2008, nearly all of the rules and regulations, as printed and disseminated to residents by way of the Rules and the Directory, specifically restricted residency and use of the facilities to those over the age of 18.  At least one family, the Andersons, was told that it could not live at Brookside Village because it had a child under the age of 18.  Consequently, FHCO has established its

*prima facie* case of discrimination under the FHAA because families with children have been excluded or discouraged from living at Brookside Village.

Brookside Village contends that there is no evidence that its policies constituted impermissible steering or resulted from any intent to discourage families from residing in Brookside Village.  Moreover, it argues that the policies restricting the hours that children may use the pool are responsive to objectively legitimate safety concerns, predated the FHAA and have not actually been enforced.  Similarly, it asserts that the skateboard ban is responsive to legitimate safety concerns given that Brookside Village has narrow streets and no sidewalks.

FHCO has raised serious questions as to whether families were discouraged from living at Brookside Village prior to 2009.   The rules "treat children, and thus, families with children, differently and less favorably than adults-only households."  *Fair Hous. Congress v. Weber*, 993 F Supp 1286, 1293 (CD Cal 1997) (citation omitted).  Brookside Village justifies the rules governing pool use and the skateboard ban as based on health and safety concerns.  Nevertheless, Brookside Village has failed to show how use of the pool by someone under the age of 18 after a certain time of day is more hazardous to safety, especially in light of the fact that Brookside Village also requires adult supervision at all times of anyone using the shared facilities.  It also has not submitted any evidence to support its argument that the skateboard ban is justified primarily by a safety concern.

Moreover, Brookside Village has failed to sufficiently justify the allegations related to impermissible steering practices, stating only that its CC&R and other rules and regulations were not motivated by intent to discriminate against families.  However, the record contains evidence, in addition to the Anderson's eviction, of a discriminatory intent.  The November 2007 issue of The Villager reported that Brookside Village had become aware that new residents were not

being informed of "what they can and cannot do when the move in," as evidenced by recent rule violations, including "underage children" in the Village.  Michelsen Decl., Ex. D, p. 29.  The newsletter encouraged people to review the CC&R, specifically stating that "children under the age of eighteen cannot live in the Village.  To disregard any warnings can lead to eviction, fines or both."  *Id*, pp. 29-30.

Thus, Brookside Village has failed to establish a genuine issue of material fact that its policies that discriminated against families were justified.  Accordingly, FCHO should be granted summary judgment on its claims for familial status discrimination against Brookside Village under the FHAA, 42 USC § 3604 (a), (b), and (c), and under ORS 659A.421 (c), (d), (e), and (j), to the extent that those claims are based on discriminatory policies prior to June 2009.

## III.   Negligence Claim

FHCO also alleges negligence claims against both defendants on the basis of a failure to train employees on the requirements of the FHAA.  As noted above, FHCO lacks standing to bring any claim against Bradley Realty.  Thus, only the negligence claim against Brookside Village (Seventh Claim) is addressed.

Brookside Village argues that FHCO cannot prove its negligence claim because, in the absence of any evidence that the FHAA or Oregon's fair housing statute is designed to expand the scope of common law duties, those statutes are the exclusive remedy.  Moreover, as stated in ORS 659A.003(2), Oregon's fair housing statue is intended to "provide an adequate remedy for persons aggrieved by certain acts of unlawful discrimination because of . . . familial status."

FHCO responds that whether an Oregon statute can give rise to a common law negligence claim is largely a question of legislative intent.  In support, it relies primarily on *Simpkins v. Connor*, 210 Or App 224, 231-33, 150 P3d 417, 421-23 (2006),which concluded that

the relevant statute imposed a common law duty on the defendant to produce medical records. Based on the statutory text, the court found that the legislature clearly intended to "impose a duty on health care providers . . . to produce medical records to patients or persons authorized to request such records," and that such a duty constituted a "special relationship" that can confer a common law duty.  *Id* at 231-32, 150 P3d at 421-22.

When Oregon courts examine the existence of a duty where, as here, the plaintiff seeks only economic damages, the analysis focuses on whether a "special relationship" exists between the parties due to a "status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty."  *Buchler v. State by & through Or. Corr. Div.*, 316 Or 499, 504, 853 P2d 798, 800 (1993) (*en banc*), quoting *Fazzolari v. Portland Sch. Dist. No. 1J*, 303 Or 1, 19, 734 P2d 1326, 1337 (1987).   A special relationship is required because common law negligence has not traditionally provided a remedy for purely economic losses in the absence of a specific duty.  *Fazzolari*, 303 Or at 7, 734 P2d at 1330.  This duty can arise from a statute.  *Simpkins*, 210 Or App at 231, 150 P3d at 421.  When determining whether a statute creates a duty for purely economic loss, the court must determine whether the legislature intended to impose such a duty by first examining the statute's text, and then, if that does not establish the legislature's intent, by examining the legislative history.  *Id*.

FHCO cites no Oregon case analyzing the particular issue presented here, namely whether Oregon's fair housing statute is intended to impose a duty in the common law negligence context and whether the requisite special relationship exists between an "aggrieved person" under ORS 659A.885(9) and a housing development engaging in discrimination.  The only case cited by FHCO, *Simpkins*, is factually and legally distinguishable from this case in

every way.  Thus, it is of limited usefulness other than to set forth the general framework for determining whether a statute creates a duty.

Despite the absence of Oregon authority, other courts have concluded that the FHAA does not create a standard of care applicable to negligence claims.  *See, e.g.*, *Hand v. Gilbank*, 752 NYS2d 501, 502, 300 AD2d 1067, 1068 (2002) (concluding that the FHAA "was not intended to create a standard of care in negligence litigation."); *Matarese v. Archstone Pentagon City*, 761 F Supp2d 346, 365 (ED VA 2011) (granting summary judgment against a negligence claim based on a failure to train personnel on the FHAA).  The Oregon fair housing statute is generally interpreted consistently with its federal counterpart, the FHAA. *See*, *e.g.*, *McGary*, 386 F3d at 1270-71.

Thus, this court rejects FHCO's position that Oregon's fair housing statute is intended to impose a common law duty on housing developments such as Brookside Village to train their employees in fair housing laws.  Because FHCO has failed to establish the existence of a duty for its purely economic losses, its negligence claim fails.  Accordingly, Brookside Village should be granted summary judgment against FHCO's negligence claim.

## **RECOMMENDATIONS**

(1)  Bradley Realty's Motion for Summary Judgment (docket #104) should be GRANTED, and a Judgment should be entered dismissing all claims against it;

(2)  Plaintiff's Motion for Partial Summary Judgment (docket #107) should be GRANTED as the First and Fourth Claims (housing discrimination) against Brookside Village that are based on policies in place prior to June 2009, DENIED as its First and Fourth Claims against Brookside Village arising after June 2009, DENIED as to the Seventh Claim (negligence) against Brookside Village, and DENIED as to all claims against Bradley Realty;

(3)  Brookside Village's Motion for Summary Judgment (docket #110) should be GRANTED as to the First and Fourth Claims (housing discrimination) as to conduct after Brookside Village became HOPA compliant in June 2009, DENIED as to the First and Fourth claims as to conduct prior to June 2009, and GRANTED as to the Seventh Claim (negligence).

Thus, the only remaining claims are the First and Fourth Claims for damages against Brookside Village for housing discrimination before it became HOPA complaint in June 2009.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Monday, November 05, 2012.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

DATED October 19, 2012.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

49 - FINDINGS AND RECOMMENDATIONS